AO 91 (Rev. 11/11) Criminal Complaint

AUSA Jeremy Daniel (312) 469-6314
AUSA Jeannice W. Appenteng (312) 353-5357

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MAGISTRATE JUDGE WEISMAN

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KENNETH HINES, - 1<br>also known as "Chuck," "C," and "Skybox;"<br>DANIEL FUNCHES, - 2<br>also known as "Makk;" and<br>WILLIAM THOMAS - 3 | CASE NUMBER: 17CR 135<br><br>**UNDER SEAL** |

FILED

MAR 07 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

From no later than July 2016 to in or about January 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants KENNETH HINES, DANIEL FUNCHES, and WILLIAM THOMAS violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Section 846 | The defendants did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1). |

This criminal complaint is based upon these facts:

X Continued on the attached sheet.

JACOB BLEDSOE
Special Agent, Drug Enforcement Administration (DEA)

Sworn to before me and signed in my presence.

Date: March 7, 2017

*Judge's signature*

City and state: Chicago, Illinois

M. DAVID WEISMAN, U.S. Magistrate Judge
*Printed name and Title*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS | SS

**AFFIDAVIT**

I, Jacob Bledsoe, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been so employed for 7 years. My current responsibilities include the investigation of narcotics trafficking offenses.

2. I have received special training in the area of narcotics investigations, money laundering and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have experience with a wide range of investigative techniques, including various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances. I have participated in numerous investigations involving violations of narcotics laws.

3. This Affidavit is submitted in support of criminal complaints alleging the violations listed below and arrest warrants for the defendants named in each criminal complaint. The criminal complaints allege:

a. From no later than July 2016 to in or about January 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendants KENNETH HINES, also known as "Chuck" and "Skybox," DANIEL FUNCHES, also known as "Makk," and WILLIAM THOMAS did conspire with each

other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846 (*see* paragraphs 9-76);

b. On or about January 23, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, FERNANDO RANGEL, knowingly and intentionally distributed a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* paragraphs 62-76);

c. On or about January 24, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, MARK CAREY, knowingly and intentionally possessed with intent to distribute a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) (*see* paragraphs 61-75).

4. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to support the criminal complaints and arrest warrants identified in paragraph 3, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the offense alleged in the criminal complaints.

5. This Affidavit is based on my personal knowledge, information provided to me by other law enforcement officers, information obtained from court-authorized wire and electronic intercepts, information provided by confidential informants, information obtained from consensually-recorded telephone calls, information obtained from consensually-recorded in-person meetings, surveillance reports, arrest and incident reports, laboratory reports, my training and experience, and the training and experience of other law enforcement officers with whom I have consulted.

**OVERVIEW OF THE INVESTIGATION**

6. This Affidavit is based on an investigation conducted by the DEA and the Chicago Police Department ("CPD") into the narcotics trafficking activities of KENNETH HINES, DANIEL FUNCHES, WILLIAM THOMAS, and their associates.

7. The investigation included the court-authorized interception of wire and electronic communications over multiple cellular telephones, including cellular telephones used by HINES (Target Phone 5, Target Phone 8, Roving Phone 1, and

Roving Phone 2) and FUNCHES (Target Phone 6 and Target Phone 7). Specifically, Chief Judge Rubén Castillo authorized, each for a period of thirty days, the interception of wire communications to and from Target Phone 5 (312-659-7047) on September 14, 2016; the interception of wire communications to and from Target Phone 6 (773-814-9175) and Target Phone 7 (872-731-7042) on November 22, 2016; and the interception of electronic communications to and from Target Phone 8 (928-216-1185), as well as the roving interception of electronic communications to and from the various and changing cellular telephones used by KENNETH HINES (Roving Phone 1 (702-886-8170) and Roving Phone 2 (702-886-7896)), on December 30, 2016.

**FACTS ESTABLISHING PROBABLE CAUSE**

8. During this investigation, as described in further detail below, DEA and CPD learned that KENNETH HINES distributed wholesale quantities of heroin and cocaine on Chicago's west side. HINES used DANIEL FUNCHES to distribute narcotics and WILLIAM THOMAS to distribute narcotics and to collect payments from customers who received narcotics from HINES. DEA and CPD also learned that HINES purchased wholesale quantities of heroin and cocaine from FERNANDO RANGEL (*see* paragraphs 61-76), and that HINES distributed wholesale quantities of heroin and cocaine to MARK CAREY (*see* paragraphs 61-76).

### A. July 18, 2016 – HINES Distributed Approximately 24 Grams of Heroin to a Confidential Source, CS-4

9. According to CS-4,[1] CS-4 met with HINES[2] in early July 2016. Because this meeting did not take place at law enforcement's direction, the meeting was not recorded. According to CS-4, during this meeting, HINES told CS-4 that CS-4 should contact HINES at Target Phone 5 if CS-4 wanted to buy narcotics from HINES. CS-4 then relayed this information to law enforcement.

---

[1] CS-4 began cooperating in this investigation in or around July 2016, and has provided law enforcement with background and intelligence information concerning HINES. Law enforcement has corroborated some of this information through the controlled buys and recorded conversations described in this Affidavit, through information received from other confidential sources, and through physical surveillance. Based on this corroboration, CS-4 has proven reliable and truthful. CS-4 has multiple prior felonies, including convictions for possession of a controlled substance. CS-4 is cooperating in this investigation, and previously has cooperated in other investigations, in exchange for money. CS-4 has received payments totaling approximately $20,400 in connection with this and other investigations. On or about January 6, 2017, CS-4 was arrested during a traffic stop for possession of a controlled substance. Local prosecutors, in their discretion and independent of this investigation, dismissed the charges against CS-4. The government has not made any promises to CS-4 or taken any actions on CS-4's behalf concerning CS-4's January 2017 arrest.

[2] The identification of HINES in this Affidavit is based on the following: (1) when shown a known photograph of HINES obtained from a law enforcement database, CS-4 identified the person in the photograph as HINES; and (2) a law enforcement officer compared a known photograph of HINES obtained from a law enforcement database with the individual the law enforcement officer saw meet with CS-4 on July 18, 2016, and determined that the individual who met with CS-4 on July 18, 2016, was the person in the photograph.

The identification of HINES' voice in this Affidavit is based on the following: (1) CS-4 compared HINES' voice, which CS-4 heard when meeting with HINES in person, with the voice recorded during CS-4's consensually-recorded telephone calls and meetings with HINES and determined that they were the same voice; and (2) in the summaries of intercepted calls in this Affidavit that identify HINES as a speaker, a monitor who has listened to one or more of the consensually-recorded telephone calls or meetings between HINES and CS-4 compared the voice heard during the intercepted calls with the voice identified as HINES' voice on the consensual recordings and identified the voice on the intercepted call as HINES' voice.

10. On or about July 18, 2016, at approximately 3:30 p.m., CS-4 met with law enforcement at a predetermined location in Chicago, Illinois. At approximately 3:53 p.m., at the direction and in the presence of law enforcement, CS-4 contacted HINES at Target Phone 5. A law enforcement officer who was with CS-4 at the time saw CS-4 dial the telephone number for Target Phone 5. During this conversation, which CS-4 consensually recorded,[3] CS-4 asked HINES, "You in the area yet? I was, I was trying to play around right quick." The Affiant believes, based on this conversation, information received from CS-4, and the investigation to date, that CS-4 asked HINES if CS-4 could purchase narcotics from HINES.

11. Following this telephone conversation, law enforcement searched CS-4 and CS-4's vehicle for contraband or excessive amounts of money but did not find either. Law enforcement then provided CS-4 with approximately $2,500 in United States currency to purchase heroin from HINES. CS-4 then left the predetermined location to meet with HINES. Law enforcement officers (referred to herein as "surveillance") followed CS-4 as CS-4 traveled to meet HINES.

---

[3] Some of the recorded conversations, and meetings (the "recorded conversations") have been summarized in this Affidavit. I based the language quoted from the recorded conversations throughout this Affidavit on a preliminary review of the recorded conversations conducted by me or other law enforcement officers—and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations. At various points in this Affidavit, I have included in brackets my interpretation of words and phrases used during the recorded conversations. I based my interpretations on the content and context of the recorded conversations, events occurring before or after the recorded conversations, information received from confidential sources, my knowledge of the investigation as a whole, my training and experience, and the training and experience of other law enforcement officers involved in this investigation.

12. At approximately 4:07 p.m., surveillance saw CS-4 park near the intersection of 5th Avenue and Kenneth Avenue in Chicago. After CS-4 parked, surveillance saw CS-4 get out of CS-4's vehicle and meet with an individual subsequently identified as HINES.[4] After a brief conversation between CS-4 and HINES, surveillance saw the two walk east bound on 5th Avenue. Surveillance then saw CS-4 walk away from HINES and toward a gray Jeep Cherokee bearing Illinois license plate number Q264993. Surveillance then saw CS-4 get into the Jeep Cherokee on the passenger's side. According to CS-4, HINES directed CS-4 to the Jeep Cherokee and told CS-4 to take the heroin from the center console and leave the $2,500 in the center console, which CS-4 reports that he did. Shortly after CS-4 got into the Jeep Cherokee, surveillance saw CS-4 get out of the Jeep Cherokee and return to CS-4's vehicle. CS-4, followed by surveillance, then drove away.

13. At approximately 5:41 p.m., CS-4 met with law enforcement at a predetermined location. At this meeting, CS-4 gave law enforcement a clear, plastic bag contained a tan, rock-like substance. Law enforcement performed a field test of the tan, rock-like substance, which indicated positive for the presence of heroin. Law enforcement then searched CS-4 and CS-4's vehicle for contraband or excessive amounts of money but did not find either.

14. On or about August 1, 2016, the DEA North Central Laboratory confirmed that the tan, rock-like substance that HINES sold to CS-4 on July 18, 2016, contained approximately 24.4 grams of heroin.

---

[4] Law enforcement did not record this meeting between CS-4 and HINES.

**B. August 10, 2016 - HINES Arranged for THOMAS to Distribute Approximately 24 Grams of Heroin to CS-4**

15. On or about August 10, 2016, at approximately 9:32 a.m., during a consensually-recorded communication, CS-4, at the direction of law enforcement sent a text message (call session #9) to HINES at Target Phone 5. In this text message, CS-4 wrote, "yooo call me wen u get this." At approximately 11:16 a.m., during a consensually-recorded communication, CS-4 received a series of text messages from HINES, who was using a different telephone number, 630-822-1316 ("Hines Phone 2"). HINES wrote: "This C [HINES, who CS-4 also knows as "Chuck" or "C"] lock this in" (call session #10); "This C lock this in [save this number]" (call session #11); and "I'll be that way in a hr" (call session #12). At approximately 11:17 a.m., CS-4 replied, "Yep" (call session #13). The Affiant believes that, based on this conversation and the investigation to date, HINES told CS-4 to save the telephone number for Hines Phone 2 in CS-4's telephone and that HINES would meet with CS-4 soon.

16. At approximately 11:35 a.m., during a consensually-recorded communication, CS-4 called HINES at Target Phone 5 but received no answer. At approximately 11:36 a.m., CS-4 sent a text message (call session #15) to HINES at Hines Phone 2. In this text message, CS-4 wrote, "Yo." At approximately 11:40 a.m., CS-4 sent another text message (call session #16) to HINES at Hines Phone 2. CS-4 wrote, "Aye um gone need them jordans [fentanyl-laced heroin] this time not them cheap prowings [heroin]." HINES, who was using Hines Phone 2, replied (call session #17), "Koo." The Affiant believes that, based on this conversation and the

investigation to date, CS-4 told HINES that CS-4 wanted to purchase fentanyl-laced heroin and not heroin from HINES and HINES replied "cool."

17. At approximately 3:30 p.m., during a consensually-recorded communication, CS-4 sent a text message (call session #18) to HINES at Hines Phone 2. In this text message, CS-4 wrote, "Yooo u in the area yet." HINES, using Hines Phone 2, replied (call session #19), "Shop." CS-4 then wrote (call session #20), "Yep." At approximately 3:56 p.m., CS-4 wrote (call session #21), "How long?" Approximately three minutes later, HINES, using Hines Phone 2, wrote (call session #22), "20 mins." At approximately 4:33 p.m. and 4:46 p.m., CS-4 called HINES at Hines Phone 2 but HINES did not answer. At approximately 5:00 p.m., CS-4, sent a text message (call session #27) to HINES at Hines Phone 2. In this text message, CS-4 wrote, "Aye I had 2 move around let me know wen you ready gotta beat traffic." The Affiant believes that, based on these communications and the investigation to date, CS-4 unsuccessfully tried to set a time to meet to conduct a heroin transaction with HINES.

18. Later that day, at approximately 7:25 p.m., during a consensually-recorded communication, CS-4 received a text message (call session #28) from HINES, who was using Hines Phone 2. HINES wrote, "My bad my boy bout to call u same way tho?" At approximately 7:44 p.m., CS-4 replied (call session #34), "Need dat wat we spoke on dem jordans [fentanyl-laced heroin] yea quake." At approximately 7:46 p.m., CS-4 wrote (call session #35), "How long?" The Affiant believes that, based on these communications and the investigation to date, HINES

apologized for not setting a time to meet with CS-4 and told CS-4 that HINES would have his associate contact CS-4 to conduct the transaction.

19. At approximately 8:35 p.m., during a consensually-recorded communication, CS-4 sent a text message to HINES at Hines Phone 2. In this text message, CS-4 wrote (call session #38), "Talk 2 me can we get this done 2nite I been sittn all day um at my joint now". At approximately 8:44 p.m., WILLIAM THOMAS,[5] using 312-731-8687 ("Thomas Phone 1"), made a telephone call to CS-4, who was using the CS-4 Phone 1, which was consensually recorded (call session #39). During this conversation, CS-4 stated, "Hello." THOMAS replied, "Cuz what up with you?" CS-4 replied, "Not a whole lot, what's up with you?" THOMAS replied, "Shit my boy [HINES] uh just told me to hit you." CS-4 replied, "Oh ok, ok. I'm at the club. You know where I'm at?" THOMAS replied, "Where right there? Where at?" CS-4 replied, "Who is this?" THOMAS replied, "This is (unintelligible) he [HINES] told me to hit you." CS-4 replied, "Ok." THOMAS replied, "I don't know which one you at though." CS-4 replied, "Alright I'm at the two ninety, but I'll be

---

[5] The identification of THOMAS in this Affidavit is based on the following: On August 10, 2016, following the meeting between THOMAS and CS-4, law enforcement presented CS-4 with a photo array that contained a known photograph of THOMAS. CS-4 identified the photograph of THOMAS as the person who CS-4 met with and who sold drugs to CS-4. In addition, a law enforcement officer who saw THOMAS meet with CS-4 on August 10, 2016, compared a known photograph of THOMAS to the person the surveillance officer observed meet with CS-4 and determined that they were the same person.

The identification of THOMAS' voice in this Affidavit is based on the following: CS-4 compared THOMAS' voice, which CS-4 heard when meeting with THOMAS in person, with the voice recorded during CS-4's consensually-recorded telephone calls and meetings with THOMAS and determined that they were the same voice. In addition, during consensually recorded telephone calls, THOMAS arranged to meet with CS-4 in person on August 10, 2016, and surveillance subsequently saw THOMAS meet with CS-4.

there in like uh, give me about a good ten minutes or so." THOMAS replied, "The one right past the, the one past the Lou right?" CS-4 replied, "Yeah uh, yeah the after hour joint." Later during the conversation, CS-4 stated, "You gonna come down on St. Louis, St. Louis and Harrison?" THOMAS replied, "Yeah I'm gonna be pulled a little bit past there but I, I ain't gonna pull right in the front, I'll be sitting a little bit past there but I'll be right there though." CS-4 replied, "Alright uh, what kind of car you in? So I know, I don't wanna just walk up on no motherfucker." THOMAS replied, "The little, it's a, a little brown, little brown little joint." The Affiant believes that, based on this conversation and on the investigation to date, THOMAS and CS-4 coordinated the time and location of a meeting at which THOMAS would deliver drugs to CS-4.

20. At approximately 8:47 p.m., CS-4 met with law enforcement at a predetermined location in Chicago. At this meeting, law enforcement searched CS-4 for contraband or excessive amounts of money but did not find either. Law enforcement then provided CS-4 with approximately $3,100 in United States currency to purchase narcotics from THOMAS. CS-4 then left the predetermined location to meet with THOMAS. Surveillance followed CS-4 to the meeting location.

21. Shortly thereafter, surveillance saw CS-4 arrive near the intersection of St. Louis Avenue and Harrison Street in Chicago. At approximately 8:50 p.m., CS-4 made a telephone call to THOMAS, using Thomas Phone 1, which was consensually recorded (call session #41). During this telephone conversation, THOMAS stated, "Hello, I'm right here finna be pulling up." CS-4 replied, "Alright,

you can come on in if you want to so you can get it together." THOMAS replied, "Uh you gone ahead and real quick so I can just keep on slide." CS-4 replied, "alright, ok." The Affiant believes that, based on this conversation and the investigation to date, that THOMAS told CS-4 that THOMAS would meet CS-4 outside.

22. At approximately 9:01 p.m., CS-4 made a telephone call to THOMAS, using Thomas Phone 1, which was consensually recorded (call session #43). During this telephone conversation, THOMAS stated, "Bro I'm finna pull up, I'm right here on Central Park." CS-4 replied, "Oh ok, I'm making sure you knew exactly where I was at. Ok." THOMAS replied, "Yeah, yeah I remember the old spot. I'm right here on uh." CS-4 replied, "Right, right." THOMAS replied, "Central Park and, right here on Millard finna pull up." CS-4 replied, "Alright." The Affiant believes that, based on this conversation and the investigation to date, that THOMAS and CS-4 agreed to meet near the intersection of Central Park Avenue and Harrison Street in Chicago.

23. A short time later, surveillance saw a brown Toyota sedan, bearing Illinois registration Q442504, park on Harrison Street near the intersection of St. Louis Avenue and Harrison Street in Chicago, which is approximately one block east of Central Park Avenue. Surveillance then saw CS-4 walk toward the Toyota sedan and lean down near the front passenger window. According to CS-4, while CS-4 was at the Toyota sedan, THOMAS gave CS-4 a clear plastic bag and CS-4 gave THOMAS $3,100. Moments later, surveillance saw CS-4 walk away from the Toyota sedan and return to CS-4's vehicle. Surveillance recorded this meeting using

video recording equipment. Surveillance followed CS-4 as CS-4 traveled to a predetermined location to meet with law enforcement.

24. At approximately 9:06 p.m., CS-4 met with law enforcement at the predetermined location. At this meeting, CS-4 gave law enforcement a clear plastic bag that contained a tan, rock-like substance that weighed approximately 25 grams. Law enforcement then searched CS-4 for contraband or excessive amounts of money but did not find either.

25. On or about August 24, 2016, the DEA North Central Laboratory confirmed that the tan, rock-like substance that THOMAS sold to CS-4 on August 10, 2016, contained approximately 24.8 grams of heroin.

**C. September 1-6, 2016 – HINES Distributed Approximately 49 Grams of Heroin to CS-4 and Arranged for Thomas to Collect Payment from CS-4**

<u>September 1, 2016 – HINES Distributes Heroin to CS-4</u>

26. On or about September 1, 2016, at approximately 12:14 p.m., during a consensually recorded conversation, CS-4 sent a text message to HINES at Hines Phone 2. That text message (call session #74) stated, "Aye if I get 25 [grams of heroin] can u gimme another one [another 25 grams of heroin] and I will have the bread [money] by Monday?" HINES responded (call session #75), "Yea."

27. Later that day, using text messages, which were consensually-recorded, CS-4 and HINES agreed to meet near the intersection of Roosevelt Road and Homan Avenue in Chicago. Prior to the meeting, law enforcement met with CS-4 and searched CS-4 for contraband and for excessive amounts of money but did not

find either. Surveillance set up near this intersection. At approximately 8:11 p.m., surveillance saw HINES, driving a black Chevrolet sedan bearing Illinois license plate # Y955390, park in a parking lot located near 3451 West Roosevelt Road in Chicago. Surveillance then saw CS-4 park CS-4's vehicle near HINES' vehicle, exit CS-4's vehicle, and get into HINES' vehicle.

28. According to CS-4, HINES gave CS-4 heroin and told CS-4 that CS-4 could pay for the heroin later. CS-4, using audio recording technology provided by law enforcement, recorded this meeting with HINES.

29. A short time later, surveillance saw CS-4 exit HINES' vehicle, return to CS-4's vehicle, and drive away. Surveillance followed CS-4 to a predetermined meet location, where CS-4 gave law enforcement a clear plastic bag that contained a tan, rock-like substance that weighed approximately 51 grams. Law enforcement then searched CS-4 for contraband and for excessive amounts of money but did not find either.

30. On or about September 28, 2016, the DEA North Central Laboratory confirmed that the tan, rock-like substance that HINES sold to CS-4 on September 1, 2016, contained approximately 49.7 grams of heroin.

<u>September 2, 2016 – THOMAS Collects $2,500 from CS-4</u>

31. On or about September 2, 2016, at approximately 3:24 p.m., during a consensually-recorded communication, CS-4 sent a text message (call session #107) to HINES, who was using Hines Phone 2. CS-4 wrote, "Yooo." Approximately one minute later, CS-4 sent another text message (call session #108) to HINES, who

was using Hines Phone 2. CS-4 wrote, "U around." Later that day, at approximately 4:12 p.m., during a consensually-recorded communication, CS-4 sent another text message (call session #111) to HINES, who was using Hines Phone 2. CS-4 wrote, "I got 2 move around way." HINES, who was using Hines Phone 2, replied (call session #112), "Yo." CS-4 replied (call session #113), "Wya [where you at]." HINES, using Hines Phone 2, replied (call session #114), "Bout to have my boy slide on." CS-4 replied (call session #115), "Ok I got only da 25 [$2,500 for the heroin HINES provided on consignment on September 1, 2016]." HINES, using Hines Phone 2, replied (call session #116), "Ok." At approximately 4:30 p.m., HINES, using Hines Phone 2, sent CS-4, who was using the CS-4 phone, a text message (call session #117). HINES wrote, "+[telephone number for Thomas Phone 1]." The Affiant believes that, based on these communications and the investigation to date, CS-4 told HINES that CS-4 had a partial payment for the heroin CS-4 received from HINES on September 1, 2016, and that HINES told CS-4 to contact THOMAS at Thomas Phone 1 to coordinate payment.

32. Later that day, at approximately 4:36 p.m., during a consensually-recorded communication, CS-4 made an outgoing telephone call (call session #121) to THOMAS, who was using Thomas Phone 1. During this telephone call, THOMAS stated, "What's happening?" CS-4 replied, "Chillin, chillin. Um I gotta link up with ya. I'm gonna be at the Walgreens on Homan." THOMAS replied, "You say where?" CS-4 replied, "Hold on. Who is this, Chuck [HINES] just shot me this number." Later during the conversation, THOMAS stated, "Ah, yeah, yeah, yeah. How long

you gonna be before you make it up there bro?" Later, THOMAS stated, "I don't even know who this is cuz, I can't even make out who the fuck this is. This number I don't even . . . Chuck [HINES] said you gonna call me." CS-4 replied, "right, right, right, ok. Yeah, um. I'll be there in probably thirty minutes." The Affiant believes that, based on these communications and the investigation to date, CS-4 and THOMAS coordinated a time and location to meet so that CS-4 could give THOMAS the partial payment for the heroin CS-4 received from HINES on September 1, 2016.

33. Later that day, at approximately 4:40 p.m., law enforcement met with CS-4 at a predetermined meet location and searched CS-4 and CS-4's vehicle for contraband or excessive amounts of money with negative results. After the search, law enforcement provided CS-4 with $2,500 in cash. CS-4 then departed the area and drove to a Walgreens parking lot located at 3401 W. Roosevelt Road in Chicago, Illinois. Surveillance observed CS-4 travel to the meeting location.

34. Later that day, at approximately 5:10 p.m., surveillance observed a brown Toyota sedan, bearing Illinois registration Q442504, enter the Walgreens parking lot. Approximately one minute later, during a consensually-recorded communication, CS-4 received an incoming telephone call (call session #122) from THOMAS, who was using Thomas Phone 1. During this telephone call, THOMAS stated, "Cuz you made it up there?" CS-4 replied, "Yea, I'm here." THOMAS replied, "Alright, I'm a couple seconds away." CS-4 replied, "Huh?" THOMAS replied, "I'm right here, pulling up." CS-4 replied, "Oh alright, you'll see me I'm backed in." The

Affiant believes that, based on this conversation and the investigation to date, THOMAS told CS-4 that Thomas was nearby.

35. Immediately after this telephone conversation, surveillance saw THOMAS park the Toyota sedan in the parking lot. Surveillance then saw THOMAS exit the Toyota sedan and enter into the front passenger's seat of CS-4's vehicle. CS-4, using audio recording technology provided by law enforcement, recorded this meeting. Approximately one minute later, surveillance observed THOMAS exit CS-4's vehicle, re-enter the Toyota sedan, and drive away. CS-4 also departed the area, and surveillance followed CS-4 until CS-4 met with law enforcement at a predetermined location. At this meeting, law enforcement searched CS-4 for contraband and for excessive amounts of money but did not find either. CS-4 told to law enforcement that CS-4 gave the $2,500 in cash to THOMAS.

September 6, 2016 – THOMAS Collects Remaining $2,500 from CS-4

36. A few days later, on or about September 6, 2016, at approximately 1:05 p.m., during a consensually-recorded communication, CS-4 made an outgoing telephone call (call session #126) to HINES, who was using Target Phone 5. During the telephone call, CS-4 stated, "What up yo, what's good?" HINES replied, "I can't call it, what the deal?" CS-4 replied, "Shit, trying to clear up with you." Later during the conversation, HINES stated, "Im finna head that way in a minute." CS-4 replied, "Alright uhh . . . then text me or call when you close so I can be already in the in the line in motion." HINES replied, "Alright." The Affiant believes that, based on these communications and the investigation to date, CS-4 and HINES agreed to

meet at a later time so that CS-4 could pay HINES the rest of the money CS-4 owed for the 50 grams of heroin CS-4 received on consignment from HINES on or about September 1, 2016.

37. Later that day, at approximately 4:59 p.m., during a consensually-recorded communication, CS-4 made an outgoing telephone call (call session #133) to HINES, who was using Hines Phone 2. The telephone call went unanswered. Approximately one minute later, CS-4 received an incoming text message (call session #134) from HINES, who was using Hines Phone 3.[6] HINES wrote, "Slide on my boy [THOMAS] for me +[telephone number for Thomas Phone 1]." HINES, using Hines Phone 3, sent another text message (call session #135) to CS-4, who was using the CS-4 Phone 1. HINES wrote, "My bad for taking so long tx." The Affiant believes that, based on these communications and the investigation to date, HINES directed CS-4 to contact THOMAS to deliver the remaining payment for the 50 grams of heroin CS-4 received on consignment from HINES on or about September 1, 2016.

38. Later that day, at approximately 5:04 p.m., during a consensually-recorded communication, CS-4 sent an outgoing text message (call session #137) to

[6] The identification of HINES as the user of Hines Phone 3 is based on the following: The text message sent to CS-4 from Hines Phone 3 on September 6, 2016, during which HINES provided the telephone number for Thomas Phone 1, and the events summarized in paragraphs 38-40, which describe THOMAS picking up payment for heroin that HINES provided to CS-4. In addition, law enforcement obtained toll records from T-Mobile, as well as pen register and trap and trace data, for Hines Phone 3 for the period beginning September 5, 2016, through December 23, 2016. An analysis of those records reveals that, during this period, there were approximately 493 text messages exchanged between HINES, using Hines Phone 3, and THOMAS, using Thomas Phone 1, with the last contact occurring on September 29, 2016.

THOMAS, who was using Thomas Phone 1. CS-4 wrote, "Where u wanna meet cause I cant sit long." Immediately after this text message was sent, CS-4 made an outgoing telephone call (call session #138) to THOMAS, who was using Thomas Phone 1. During this telephone conversation, THOMAS stated, "I'm finna, um, I'm busting this quick move real quick and I'm finna pop back out. I had to step in for a couple of minutes. CS-4 replied, "Right, right, right, ok. Cause I ain't wanna sit too long with this, with this type of change [money] on me." THOMAS replied, "Alright, I'm finna um, shit I'll catch um right here at the Walgreens on Roosevelt. I should be there, give me about ten, fifteen minutes. I'll be right there at the Walgreens." CS-4 replied, "Ok, that's a little better then. Alright, I'll be there." The Affiant believes that, based on these communications and the investigation to date, CS-4 and THOMAS coordinated a time and location to meet so that CS-4 could give THOMAS partial payment for the heroin CS-4 received from HINES on or about September 1, 2016.

39. Later that day, at approximately 5:05 p.m., law enforcement met with CS-4 at a predetermined meet location and searched CS-4 and CS-4's vehicle for contraband and for excessive amounts of money but did not find either. After the search, law enforcement provided CS-4 with $2,500 in cash. CS-4 then departed the area and drove to a Walgreens parking lot located at 3401 W. Roosevelt Road in Chicago. Surveillance followed CS-4 to the meeting location.

40. At approximately 5:18 p.m., surveillance observed THOMAS enter the Walgreens parking lot in a black Jeep, bearing Illinois registration Q202696, and

park near CS-4's vehicle. After THOMAS parked, THOMAS exited the black Jeep and entered the front passenger seat of CS-4's vehicle. Approximately one minute later, surveillance observed THOMAS exit CS-4's vehicle, re-enter the black Jeep and depart the area. Surveillance video recorded the meeting between CS-4 and THOMAS. CS-4 departed the area, and surveillance followed CS-4 until CS-4 met with law enforcement at a predetermined location. At this meeting, law enforcement searched CS-4 for contraband or excessive amounts of money but did not find either. CS-4 told law enforcement that CS-4 gave THOMAS the $2,500 in cash.

**D. October 10, 2016 –THOMAS Picks Up Approximately $132,800 from 36 South Ashland Avenue to Purchase Narcotics**

41. On October 10, 2016, at approximately 9:23 a.m., surveillance saw THOMAS leave a residence located at 1232 South Lawndale Avenue in Chicago, get into a brown Toyota sedan bearing Illinois registration Q442504, and drive away. At approximately 9:37 a.m., based on information received from a court-authorized tracking device on the brown Toyota sedan, surveillance located the brown Toyota sedan parked near 1601 West Monroe Street in Chicago. At this time, surveillance saw that the brown Toyota sedan was unoccupied. At approximately 9:48 a.m., surveillance saw THOMAS leave 36 South Ashland Avenue in Chicago carrying a plastic, red and white bag that appeared to be full. Surveillance saw THOMAS put the plastic bag, which appeared to be a Target bag, in the front passenger seat of the brown Toyota sedan and drive away. Surveillance followed the brown Toyota sedan.

42. At approximately 10:03 a.m., surveillance saw THOMAS park the brown Toyota sedan near 1732 North Damen Avenue in Chicago. Shortly after THOMAS parked, surveillance saw THOMAS talking on a cellular telephone. At approximately 10:07 a.m., surveillance saw THOMAS drive away and followed THOMAS.

43. At approximately 10:10 a.m., surveillance saw THOMAS park the brown Toyota sedan behind a silver Chevrolet Trailblazer bearing Illinois registration E651610 in an alley on the 1800 block of North Leavitt Street in Chicago, Illinois. Surveillance then saw THOMAS get out of the brown Toyota sedan carrying the Target bag and then put the Target in the rear storage area of the Trailblazer. According to surveillance, THOMAS then walked toward the front driver's side door of the Trailblazer. While THOMAS was standing near the driver's side door of the Trailblazer, surveillance saw the driver of the Trailblazer ("INDIVIDUAL A") give THOMAS a tightly-wrapped plastic bag containing what appeared to be a large rectangular-shaped object. According to surveillance, the shape of the object in the plastic bag was consistent with the shape of kilogram quantities of narcotics.

44. After the transaction, surveillance saw THOMAS return to the brown Toyota sedan and drive away. At approximately the same time, surveillance saw the Trailblazer drive away. Surveillance followed the Trailblazer and, at approximately 10:17 a.m., surveillance saw the Trailblazer drive through a crosswalk without yielding to pedestrians at the intersection of Schiller and Damen Avenues in

Chicago. Surveillance then activated their emergency lights and curbed the Trailblazer near 1459 North Damen Avenue in Chicago.

45. During the traffic stop, law enforcement explained to INDIVIDUAL A that the traffic violation was the reason for the stop. INDIVIDUAL A then provided law enforcement with an Illinois Secretary of State Temporary Visitor's Driver's License with his name and photograph on it. Law enforcement then asked INDIVIDUAL A for consent to search the Trailblazer, and INDIVIDUAL A agreed. During the search, law enforcement saw the Target bag in the rear passenger area of the vehicle. Law enforcement discovered a large sum of money in the bag; which, after a count, law enforcement determined to be approximately $132,800. When asked about the money in the bag, INDIVIDUAL A denied any knowledge of the money and told law enforcement "I know nothing, this is not my car." After INDIVIDUAL A signed a Disclaimer of Ownership and Knowledge of Ownership form, which was written in English and Spanish, law enforcement seized the money in the Target bag.

46. Based on the shape of the object surveillance saw INDIVIDUAL A hand to THOMAS and the amount of money seized from INDIVIDUAL A, which was in the bag THOMAS gave INDIVIDUAL A, the Affiant believes that INDIVIDUAL A sold THOMAS two kilograms of heroin, which, based on my

training and experience, costs approximately $65,000 per kilogram.[7] The Affiant further believes that THOMAS retrieved that money from the Ashland Address.

### E. October 20, 2016 – FUNCHES Distributed Approximately 25 Grams of Heroin to CS-4

47. According to CS-4, in October 2016, CS-4 met with an individual known to CS-4 as "MAKK," who has been subsequently identified as DANIEL FUNCHES.[8] On or about October 18, 2016, at approximately 4:14 p.m., during a consensually-recorded communication, CS-4, at the direction of law enforcement, called FUNCHES (call session #187) at Target Phone 7, the telephone number for which CS-4 received from FUNCHES during a prior meeting that did not take place at the direction of law enforcement. During this telephone conversation, FUNCHES

[7] Though law enforcement completed a traffic stop statistical study card to document the reason for the traffic stop, law enforcement did not issue INDIVIDUAL A citation. To avoid jeopardizing an ongoing investigation, law enforcement did not arrest INDIVIDUAL A. After leaving the alley where he gave INDIVIDUAL A the money, THOMAS was able to evade surveillance.

[8] The identification of FUNCHES in this Affidavit is based on the following: When shown a known photograph of FUNCHES obtained from a law enforcement database, CS-4 identified the person in the photograph as MAKK. In addition, a law enforcement officer compared a known photograph of FUNCHES taken from a law enforcement database with the individual the law enforcement officer saw meet with CS-4 on October 20, 2016, and determined that the individual who met with CS-4 on October 20, 2016, was the person in the photograph.

The identification of FUNCHES' voice is based on the following: CS-4 compared MAKK's voice, which CS-4 heard when meeting with MAKK in person, with the voice recorded during CS-4's consensually-recorded telephone calls and meetings with MAKK and determined that they were the same voice. In addition, during consensually-recorded telephone calls, FUNCHES arranged to meet with CS-4 in person on October 20, 2016, and surveillance subsequently saw FUNCHES meet with CS-4. Moreover, in the summaries of intercepted calls in this Affidavit that identify FUNCHES as a speaker, a monitor who listened to one or more of the consensually-recorded telephone calls or meetings between FUNCHES and CS-4 compared the voice heard during the intercepted calls with the voice identified as FUNCHES' voice on the consensual recordings and identified the voice on the intercepted call as FUNCHES' voice.

stated, "Yeah this is me what's up?" CS-4 replied, "I just got off the phone with . . . they'll [CS-4's purported drug customers] be up here sometime tonight or probably tomorrow about 4 or 5. If not I'll just eat, I'll just take it all but, I don't really be try to move like that man [CS-4 told FUNCHES that CS-4 does not sell large quantities of heroin]." FUNCHES replied, "Yeah I see, just let me know." CS-4 replied, "Aight, cause then I thought about it I thought you fucked with me a little bit the man [HINES] done gave me 50 [grams of heroin on consignment] before with no money." FUNCHES replied, "Well shit I'll have 50 something [50 grams of heroin]." The Affiant believes that, based on this conversation and the investigation to date, CS-4 and FUNCHES discussed CS-4 obtaining heroin from FUNCHES.

48. On or about October 19, 2016, at approximately 6:33 p.m., during a consensually-recorded communication, CS-4, at the direction of law enforcement, called FUNCHES (call session #189) at Target Phone 7. During this telephone conversation, CS-4 stated, "What happen boy, what's good?" FUNCHES replied, "Man I can't call it." CS-4 replied, "Chillin' chillin', hey uh, my people [CS-4's drug customers] be here tomorrow man. I could do it [the heroin transaction] tonight but I'm short like 200 but I'll just wait on them for tomorrow. They should be in about what, 12:30, 1:00 so I could link with you about 2:00 that's cool?" Later during the conversation, CS-4 stated, "Ah, we'll talk though; I'll see you tomorrow about 2:00 bro." The Affiant believes that, based on this conversation and the investigation to date, CS-4 and FUNCHES arranged a meeting for the next day so that CS-4 could obtain heroin from FUNCHES.

49. On or about October 20, 2016, at approximately 11:58 a.m., during a consensually-recorded communication, CS-4, at the direction of law enforcement, called FUNCHES (call session #191) at Target Phone 7. During this telephone conversation, CS-4 stated, "What up, hey about an hour where you want me to meet you at?" FUNCHES replied, "Shit back over in the area [a neighborhood familiar to both CS-4 and FUNCHES]." CS-4 replied, "Ok I'll call you then." The Affiant believes that, based on this conversation and the investigation to date, CS-4 and FUNCHES coordinated a time and location for the two to meet so that CS-4 could obtain heroin from FUNCHES.

50. At approximately 1:10 p.m., CS-4 met with law enforcement at a predetermined location in Chicago, Illinois. At this meeting, law enforcement searched CS-4 and CS-4's vehicle for contraband and for excessive amounts of money but did not find either. Law enforcement then provided CS-4 with approximately $2,500 in cash to purchase heroin from FUNCHES. CS-4 then left the predetermined location to meet with FUNCHES. Surveillance followed CS-4 to the meeting location.

51. At approximately 1:15 p.m., during a consensually-recorded communication, CS-4 called FUNCHES (call session #193) at Target Phone 7. During this telephone conversation, CS-4 stated, "What happened kiddo, what street is that I'm coming to? Hello?" FUNCHES replied, "You said you did what?" CS-4 replied, "I said what street I'm coming to I'm, I'm ready for you." FUNCHES replied, "Yeah, right there Joe, go on, right there between Keeler and Kolin right

there on uh Ogden." CS-4 replied, "In between Keeler and Kolin; ok, aight give nigga a sandwich or something man I know you got something in the house mother fucker." FUNCHES replied, "No man you know I ain't right there man, I had, I had left that [the heroin] over there for you man." The Affiant believes that, based on this conversation and the investigation to date, FUNCHES provided CS-4 with the location where the heroin transaction would occur.

52. At approximately 1:25 p.m., surveillance saw CS-4 park CS-4's vehicle near the intersection of Ogden and Kolin Avenues in Chicago. At approximately 1:26 p.m. and 1:28 p.m., during consensually-recorded communications, CS-4 sent text messages (call sessions #195 and #196) to FUNCHES at Target Phone 7. Each text stated, "Outside."

53. At approximately 1:28 p.m., during a consensually-recorded communication, CS-4 called FUNCHES (call session #197) at Target Phone 7. During this telephone conversation, FUNCHES stated, "Hello." CS-4 replied, "Yeah I'm outside, I'm on the uh, in between, what, Kolin and what Keeler, Kildare." FUNCHES replied, "Aight, here I come man. I thought you was sitting right there, man; sitting right here, I'm coming right now man." The Affiant believes that, based on this conversation and the investigation to date, FUNCHES told CS-4 that FUNCHES would arrive to meet CS-4 soon.

54. At approximately 1:48 p.m., surveillance saw a black Chevrolet sport utility vehicle ("SUV") bearing Illinois registration Z308845 park in a driveway located at 4332 West Ogden Avenue in Chicago. According to surveillance,

FUNCHES was in the front passenger seat of the black Chevrolet SUV. Surveillance saw FUNCHES get out of the black Chevrolet SUV and go into the Ogden Residence.

55. At approximately 1:57 p.m., surveillance saw FUNCHES exit the Ogden Residence, walk to CS-4's vehicle, and then get into the front passenger seat of CS-4's vehicle. According to CS-4, while FUNCHES was in CS-4's vehicle, CS-4 asked, "Ain't no uh, fentanyl floating around?" FUNCHES replied, "I don't know where it's at, I ain't going to lie to you." CS-4 then asked, "Ok, I need a number or how we gon do this?" FUNCHES replied, "Oh, who Chuck [HINES, who CS-4 also knows as "Chuck" or "C"]?" CS-4 replied, "Chuck, yeah." FUNCHES replied, "I don't think he's fucking around right now. He gone though." CS-4, using audio recording technology provided by law enforcement, recorded this meeting. According to CS-4, while in CS-4's vehicle, FUNCHES handed CS-4 a plastic bag containing heroin and CS-4 gave FUNCHES $2,500. The Affiant believes that, based on the investigation to date and this conversation, that FUNCHES sold heroin to CS-4 after FUNCHES spoke to HINES about CS-4.

56. Shortly after FUNCHES got into CS-4's vehicle, surveillance saw FUNCHES get out of the vehicle and return to the Ogden Residence. Surveillance then saw CS-4 depart the area and followed CS-4 until CS-4 met with law enforcement at a predetermined location. At this meeting, CS-4 gave law enforcement a clear plastic bag that contained a tan, chunky, rock-like substance. A field test of the substance contained in the plastic bag indicated positive for the

presence of heroin and the approximate weight of the substance in the plastic bag was 25 grams. Law enforcement then searched CS-4 and CS-4's vehicle for contraband and for excessive amounts of money but did not find either.

### F. November 23, 2016 – HINES Arranged for FUNCHES to Attempt to Deliver Narcotics to MARK CAREY

57. On or about November 23, 2016, beginning at approximately 12:42 p.m., during court-authorized electronic intercepts, HINES, using 424-395-7772 ("Hines Phone 5"),[9] and FUNCHES, using Target Phone 7, exchanged the following series of text messages: At approximately 12:42 p.m. (call session #10073), HINES wrote, "u gotta somebody who can catch up wit short [CAREY]." At approximately 12:43 p.m. (call session #10075), FUNCHES responded, "yup." At approximately 12:44 p.m. (call session #10077), HINES wrote, "He on the way here now.. whole matt [HINES told FUNCHES that CAREY would buy 1 kilogram of narcotics]." At approximately 12:46 p.m. (call session #10079), FUNCHES asked, "Receipt too [FUNCHES asked whether CAREY would have the money for the kilogram or whether HINES would sell the kilogram to CAREY on consignment]." At

[9] A common call analysis of telephone records revealed that, on or about October 30, 2016, HINES began using Hines Phone 5. According to those records, between October 30, 2016, and November 30, 2016, there were approximately 2,652 text messages (and 42 non-text message contacts) sent or received by Hines Phone 5 during this period. During this period, Hines Phone 5 had contact with 44 unique telephone numbers, 16 of which were in contact with a prior telephone used by HINES, 779-513-2970. Hines Phone 5 exchanged 339 text messages with THOMAS, who was using 708-200-9548, and 367 text messages with MARK CAREY, who was using Carey Phone 1. The most frequent contact during this period was FNU LNU, who was using XXX-XXX-7969 and exchanged 407 text messages with Hines Phone 5 during this period. CAREY was the most second most frequent text message contact for Hines Phone 5 during this period and THOMAS was the third most frequent. Based on this analysis and the investigation to date, I believe that HINES was the user of Hines Phone 5.

approximately 12:47 p.m. (call session #10081), HINES replied, "Yea." At approximately 12:49 p.m. (call session #10083), FUNCHES wrote, "Give him [CAREY] my # [telephone number]." The Affiant believes that, based on these communications and the investigation to date, HINES instructed FUNCHES to distribute 1 kilogram of narcotics to CAREY.

58. Beginning at approximately 1:48 p.m., during court-authorized electronic intercepts, FUNCHES, using Target Phone 7, and CAREY,[10] using 708-495-1721 ("Carey Phone 1"), exchanged the following series of text messages: at approximately 1:48 p.m. (call session #10089), CAREY wrote, where u want me to go just got on 290 [the expressway]." At approximately 2:07 p.m. (call session #10114), FUNCHES wrote, "4332 w ogden give me a minute b4 u go over there um waiting on my ride." At approximately 2:32 p.m. (call session #10120), CAREY wrote, "Heading tht way." At approximately 2:41 p.m. (call session #10126), FUNCHES responded, "On my way." At approximately 2:59 p.m. (call session #10133), CAREY wrote, "I'm parked on the side of the carwash on the side street didn't o the name grey Impala." At approximately 3:21 p.m. (call session #10139),

---

[10] The identification of CAREY in this Affidavit is based on the following: On or about November 23, 2016, surveillance saw a gray Chevrolet Impala bearing Illinois registration S284294 parked near the intersection of Kirkland and Ogden Avenues in Chicago, Illinois. Surveillance saw the driver of the vehicle momentarily exit the vehicle and survey the area. Surveillance then compared the driver of the gray Impala to a known photograph of CAREY obtained from an Illinois Secretary of State database and determined that the driver of the gray Impala was Carey. The identification of Carey Phone 1 in this Affidavit is based on the following: On or about November 23, 2016, the user of Carey Phone 1 told FUNCHES, who was using Target Phone 7, that the user of Target Phone 7 was at the intersection of Kirkland and Ogden Avenues in Chicago. Surveillance then saw CAREY parked near the intersection of Kirkland and Ogden Avenues. Moreover, on or about January 24, 2017, law enforcement arrested CAREY, as discussed below. At the time of his arrest, CAREY had Carey Phone 1 in his possession.

CAREY wrote, "Think I'm on Kirland." At approximately 3:22 p.m. (call session #10141), FUNCHES wrote, "Ok give me a sec." At approximately 3:15 p.m., surveillance saw a gray Chevrolet Impala bearing Illinois registration S284294 parked near the intersection of Kirkland and Ogden Avenues in Chicago. The Affiant believes that, based on these communications and the investigation to date, CAREY drove to an area near 4332 West Ogden to meet with FUNCHES and to buy narcotics from FUNCHES on consignment.

59. Beginning at approximately 3:38 p.m., during court-authorized electronic intercepts, FUNCHES, using Target Phone 7, and HINES, using Hines Phone 5, exchanged a series of text messages during which FUNCHES alerted HINES to law enforcement surveillance: at approximately 3:38 p.m. (call session #10143), FUNCHES wrote, "Just seen him again." At approximately 3:39 p.m. (call session #10145, HINES replied, "Van?." At approximately 3:39 p.m. (call session #10147), FUNCHES replied, "old tahoe [referring to law enforcement surveillance vehicle]." At approximately 4:01 p.m. (call session #10173), FUNCHES wrote, "Tell buddy [CAREY] its tight [law enforcement is present] give me a minute." At approximately 4:05 (call session #10175), HINES replied "ok"; At approximately 4:24 p.m. (call session #10180), CAREY, using Carey Phone 1, wrote to FUNCHES, using Target Phone 7, "Tld [HINES told] me the situation [about law enforcement presence] I'm gne [leaving]". The Affiant believes that, based on these communications and the investigation to date, FUNCHES told HINES that FUNCHES saw law enforcement in the area of the planned narcotics transaction

and, after HINES relayed that information to CAREY, CAREY told FUNCHES that the heroin transaction was off.

60. Beginning at approximately 7:06 p.m., during court-authorized electronic intercepts, FUNCHES, using Target Phone 7, and HINES, using Hines Phone 5, exchanged a series of text messages during which HINES checked to see whether FUNCHES changed telephone numbers following a law enforcement encounter: at approximately 7:06 p.m. (call session #10199), HINES wrote, "U cool?." At approximately 7:30 p.m. (call session #10203), FUNCHES replied, "Long u cool um cool." At approximately 7:32 p.m. (call session 10207), HINES wrote, "I'm thinking that day that boy slid on u and that happened with them is the day they got on u [HINES referred to the seizure of approximately $132,800 from INDIVIDUAL A, who had conducted an exchange with WILLIAM THOMAS, on or about October 10, 2016, described above in paragraphs 39-44]"; at approximately 7:32 p.m. (call session #10211), FUNCHES replied, "me too." At approximately 7:33 p.m. (call session #10213), HINES asked, "u got that number still he hit u on that day??." At approximately 7:33 p.m. (call session #10215), FUNCHES replied, "nope." The Affiant believes that, based on these communications and the investigation to date, that HINES and FUNCHES discussed the possible connection between law enforcement surveillance of FUNCHES and an earlier seizure of narcotics proceeds, as well as the need to change telephone numbers following the seizure.

### G. January 23-24, 2017 – HINES Distributes 3 Kilograms of Cocaine and 1 Kilogram of Heroin to CAREY

61. As described in more detail below, on or about January 23, 2017, at approximately 3:31 p.m., KENNETH HINES received approximately 6 kilograms of narcotics from FERNANDO RANGEL. After meeting with RANGEL, HINES went to a residence located at 1206 South Spaulding Avenue in Chicago, where he remained from approximately 4:31 p.m. to 11:32 p.m. HINES returned to the Spaulding Address on or about January 24, 2017, at approximately 1:08 p.m. Approximately 10 minutes later, HINES left the Spaulding Address carrying a black bag. HINES delivered that black bag to MARK CAREY at approximately 1:35 p.m. At approximately 3:06 p.m., law enforcement conducted a traffic stop on a vehicle driven by CAREY, during which law enforcement learned that the black bag CAREY received from HINES contained 1 kilogram of heroin and 3 kilograms of cocaine.

HINES Receives Narcotics from FERNANDO RANGEL

62. On January 23, 2017, beginning at approximately 10:27 a.m., during court-authorized electronic intercepts, HINES, using Roving Phone 1, and RANGEL,[11] using 312-890-3982 ("Rangel Phone 1"), exchanged a series of text

[11] The identification of RANGEL in this Affidavit is based on the following: On or about January 23, 2017, law enforcement conducted a traffic stop of a vehicle in which RANGEL was an occupant. During this traffic stop, a law enforcement officer compared a known photograph of RANGEL obtained from a law enforcement database with the driver of the vehicle and determined that the driver was RANGEL. The identification of RANGEL's telephone in this Affidavit is based on the following: On or about January 23, 2017, and January 24, 2017, surveillance saw RANGEL near the intersection of School and Whipple Streets in Chicago at or about the time that location information placed Rangel Phone 1

messages. During this exchange, HINES wrote (call session #575), "What time u thinking?" RANGEL responded at approximately 10:28 a.m. (call session #578), "3:00?" HINES replied at approximately 10:28 a.m. (call session #579), "Ok." At approximately 10:29 a.m., RANGEL asked (call session #581), "Truck [heroin] only?" HINES replied (call session #582), "Nah." RANGEL then asked (call session #583), "Ok. Like last time?" HINES replied at approximately 10:30 a.m. (call session #584), "Trey tray [3 kilograms of heroin and 3 kilograms of cocaine]." The Affiant believes, based on these intercepts and the investigation to date, that HINES told RANGEL that HINES wanted to buy 3 kilograms of heroin and 3 kilograms of cocaine from RANGEL.

63. On January 23, 2017, beginning at approximately 2:12 p.m., during court-authorized electronic intercepts, HINES, using Roving Phone 1, and RANGEL, using Rangel Phone 1, exchanged a series of text messages. During this exchange, RANGEL wrote (call session #648), "3:00 still?" and (call session #648) "Where?" HINES replied at approximately 2:2:13 p.m. (call session #649), "Yea" and (call session #650) "Shop." At approximately 2:17 p.m., HINES wrote (call session #651), "3:15 tho." The Affiant believes, based on these intercepts and the investigation to date, that HINES confirmed the time and location of his meeting with RANGEL. The Affiant believes, based on these intercepts and the investigation to date, that HINES arranged to meet RANGEL so that HINES could deliver payment for the 3 kilograms of heroin and 3 kilograms of cocaine to RANGEL.

---

near that intersection. In addition, on or about January 24, 2017, when law enforcement arrested RANGEL, RANGEL had Rangel Phone 1 in his possession.

64. At approximately 3:31 p.m., surveillance saw a silver Audi sport-utility vehicle ("SUV"), with Illinois license plate #E405704, being followed on Interstate 90 by a silver Nissan van, with Florida license plate #GHVS56, driven by HINES. At approximately 3:43 p.m., according to location information received for Roving Phone 1, used by HINES, and Rangel Phone 1, used by RANGEL, both HINES and RANGEL were near the intersection of School and Whipple Streets in Chicago. The Affiant believes, based on intercepted communications and the investigation to date, that HINES and RANGEL conducted a narcotics transaction while near the intersection of School and Whipple Streets in Chicago.

65. Surveillance arrived as HINES drove away from the intersection of School and Whipple Streets in Chicago. Surveillance then saw the silver Audi SU, which was parked when surveillance arrived, drive away. Surveillance followed the silver Audi SUV. At approximately 4:23 p.m., during court-authorized electronic intercepts, HINES, using Roving Phone 1, and RANGEL, using Rangel Phone 1, exchanged a series of text messages. During this exchange, RANGEL wrote (call session #662), "U think round this time 2maro?" HINES replied (call session #663), "Yea."

66. At approximately 5:09 p.m., enforcement officers conducted a traffic stop on the silver Audi SUV for failure to use a turn signal. During this traffic stop, enforcement officers identified the driver of the RANGEL and INDIVIDUAL A.[12]

<u>HINES Stores Narcotics at 1206 South Spaulding Avenue</u>

---

[12] INDIVIDUAL A is the same person who met with THOMAS on October 10, 2016, as described above in paragraphs 41-46.

67. On or about January 23, 2017, according to location information received for Roving Phone 1, used by HINES, HINES went to 1206 South Spaulding Avenue in Chicago after meeting with RANGEL and INDIVIDUAL A. At approximately 4:31 p.m., surveillance saw the silver Nissan van driven by HINES parked near 1202 South Spaulding. According to location information, HINES remained at the Spaulding Address until approximately 11:32 p.m.

68. On January 24, 2017, at approximately 1:08 p.m., surveillance, as corroborated by location information received for Roving Phone 1, used by HINES, HINES returned to the Spaulding Address. Surveillance saw HINES enter the Spaulding Address empty-handed. At approximately 1:18 p.m., surveillance saw HINES exit the Spaulding Address carrying a black backpack that, based on the information described in paragraphs 61-68, was believed to carry narcotics.

<u>HINES Distribute Narcotics to CAREY</u>

69. On January 23, 2017, beginning at approximately 4:57 p.m., during court-authorized electronic intercepts, HINES, using Roving Phone 1, and CAREY, using Carey Phone 1, exchanged a series of text messages. During this exchange, CAREY wrote (call session # 665), "Cn I come early?" HINES replied (call session #666), "Yea what time?" CAREY responded at approximately 4:58 p.m. (call session # 667), "Leave at 9 get there at 11." HINES replied (call session #668), "Make it 12." At approximately 4:59 p.m., CAREY wrote (call session #669), "OK." At approximately 5:02 p.m., CAREY then wrote (call session #670), "So everything good cuz ppl waiting on the Redd bottoms lV belts [referring to an unspecified type

of drug]." HINES replied (call session #671), "Yea." The Affiant believes that, based on these intercepts and the investigation to date, HINES and CAREY agreed to meet to conduct a narcotics transaction on January 24, 2017.

70. On January 24, 2017, at approximately 1:35 p.m., surveillance saw HINES meet CAREY near 800 South Wells in Chicago. Surveillance saw CAREY get out of a red Chevrolet SUV with Florida license plate # EVNP61, driven by INDIVIDUAL B, and take a black bag from the red Chevrolet SUV and get into a silver Nissan van driven by HINES. HINES, followed by the red Chevrolet SUV, drove to the 300 block of west Taylor Street in Chicago and stopped. Surveillance then saw CAREY get out of the silver Nissan van with a black backpack and return to the passenger side of the red Chevrolet SUV. Surveillance then saw both vehicles then drive to a nearby restaurant and park; before going into the restaurant, surveillance saw CAREY put the backpack in the rear compartment of the red Chevrolet SUV.

71. At approximately 2:01 p.m., surveillance saw CAREY and INDIVIDUAL B return to the red Chevrolet SUV and drive away. At approximately 3:06 p.m., enforcement officers conducted a traffic stop on the red Chevrolet SUV for speeding near mile marker 297 on southbound Interstate 57. During the traffic stop, a canine handler walked a drug-detection canine around the red Chevrolet SUV. The canine alerted to the rear passenger seat. Law enforcement officers then searched the red Chevrolet SUV and found a black backpack, similar to the one surveillance saw HINES leave the Spaulding Address with, containing four brick-

shaped packages, wrapped in tape and cellophane. Law enforcement arrested CAREY and INDIVIDUAL B.

72. Law enforcement conducted a field test on each of the brick-shaped packages: 1 package, weighing approximately 1,056 grams, indicated positive for the presence of heroin; 3 packages, weighing approximately 1090 grams, 1093 grams, and 1088 grams, respectively, indicated positive for the presence of heroin.

HINES Delivers Payment for Heroin and Cocaine to RANGEL

73. On January 24, 2017, at approximately 1:22 p.m., during court-authorized electronic intercepts, HINES, using Roving Phone 1, and RANGEL, using Rangel Phone 1, exchanged a series of text messages. During this exchange, RANGEL wrote (call session #723), "Wyo [what you on]?" and (call session #724) "Eta [estimated time of arrival]?" HINES replied (call session #727), I can head that way now really." RANGEL replied, "Ok, Eta?" At approximately 2:04 p.m., HINES wrote (call session #745), "20 mins." RANGEL replied (call session #748), "230 ish." The Affiant believes that, based on these intercepts and the investigation to date, HINES and RANGEL agreed to meet so that HINES could give RANGEL money for the heroin and cocaine that HINES received on January 23, 2017.

74. At approximately 3:05 p.m., surveillance saw HINES meet with RANGEL near the intersection of Whipple and School Streets in Chicago. During this meeting, surveillance saw RANGEL, who was sitting in the front passenger seat of the silver Nissan van, get out of the silver Nissan van carrying a large black bag. Surveillance saw RANGEL place that black bag in the rear compartment of the

silver Audi SUV. After RANGEL drove away in the silver Audi SUV, surveillance followed RANGEL.

75. At approximately 3:10 p.m., enforcement officers tried to conduct a stop of the vehicle driven by RANGEL, the silver Audi SUV. RANGEL did not stop and law enforcement pursued RANGEL. Law enforcement ultimately stopped RANGEL near the intersection of Superior Street and Racine Avenue in Chicago. Law enforcement arrested RANGEL for fleeing and eluding law enforcement, and searched the silver Audi SUV incident to RANGEL's arrest. During the search, law enforcement recovered a black bag containing a black plastic bag filled with approximately $149,677. The black bag looked similar to the black bag CAREY took from the red Chevrolet SUV and delivered to HINES. The Affiant believes, based on intercepted communications and the investigation to date, that the approximately $149,677 was payment, at least in part, for the narcotics HINES received from RANGEL on January 23, 2017.

<u>THOMAS Removes 2 Kilograms of Heroin from the Spaulding Address</u>

76. On or about January 24, 2017, after the arrests of CAREY and RANGEL, surveillance went to the Spaulding Address. At approximately 6:15 p.m., surveillance saw HINES enter the Spaulding Address. At approximately 6:19 p.m., surveillance saw a brown Toyota sedan bearing Illinois license plate Q442504 park near the Spaulding Address. At approximately 6:27 p.m., surveillance saw HINES leave the Spaulding Address through a rear gate, return to the silver Nissan van, and drive away. At approximately 6:28 p.m., surveillance saw THOMAS leave the

Spaulding Address carrying a large, weighted object underneath his jacket. Enforcement officers approached THOMAS as THOMAS hurriedly returned to the brown Toyota sedan, got in, and started to drive away. Enforcement officers stopped THOMAS before THOMAS could drive away, searched THOMAS and the brown Toyota sedan, and recovered 2 brick-shaped packages wrapped in cellophane and duct tape. The cellophane and duct tape packaging was similar to the packaging on the 1 kilogram of heroin recovered from CAREY. Based on my training and experience, the intercepted communications summarized above in paragraph 62, and the shape and packaging of the 2 brick-shaped packages recovered from THOMAS, including their similarities to the packaging of the heroin recovered from CAREY, the Affiant believes that the 2 brick-shaped packages wrapped in cellophane and duct tape contained heroin. Law enforcement arrested THOMAS, and then released THOMAS to avoid jeopardizing an ongoing investigation.

## CONCLUSION

77. Based on the above information, there is probable cause to believe the following:

a. From no later than July 2016 to in or about January 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, KENNETH HINES, also known as "Chuck" and "Skybox," DANIEL FUNCHES, also known as "Makk," and WILLIAM THOMAS did conspire with each other and with others known and unknown to knowingly and intentionally possess with intent to distribute and distribute a controlled substance, namely, 1 kilogram or more of a

mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846;

b. On or about January 23, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, FERNANDO RANGEL, knowingly and intentionally distributed a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1);

c. On or about January 24, 2017, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, MARK CAREY, knowingly and intentionally possessed with intent to distribute a controlled substance, namely, 1 kilogram or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

S/A [signature] #8433

JACOB BLEDSOE
Special Agent, Drug Enforcement Administration

SUBSCRIBED AND SWORN to before me on March 7, 2017.

[signature]

M. DAVID WEISMAN
United States Magistrate Judge